# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ' |
| | ' |
| **v.** | '     **CRIMINAL NO. H-21-16** |
| | ' |
| **KENNETH J. SANDEL,** | ' |
| **Defendant.** | ' |

## PLEA AGREEMENT

The United States of America, by and through Alamdar Hamdani, United States Attorney for the Southern District of Texas, and John R. Lewis, Assistant United States Attorney, and the defendant, Kenneth J. Sandel, and Defendant's counsel, pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure, state that they have entered into an agreement, the terms and conditions of which are as follows:

### Defendant's Agreement

1.  Defendant agrees to plead guilty to Count Three of the Indictment. Count Three charges Defendant with Negligent Release of Extremely Hazardous Substance, in violation of Title 42, United States Code, Section 7413(c)(4). Defendant, by entering this plea, agrees that he is waiving any right to have the facts that the law makes essential to the punishment either charged in the indictment, or proved to a jury or proven beyond a reasonable doubt.

### Punishment Range

2.  The **statutory** maximum penalty for each violation of Title 42, United States Code, Section 7413(c)(4), is imprisonment of not more than 1 year and a fine of not more than $250,000.00. *See* Title 18, United Stated Code, Section 3571(b)(4). Additionally, Defendant may receive a term of supervised release after imprisonment of up to 1 year. *See* Title 18, United States Code, Sections 3559(a)(6) and 3583(b)(3). Defendant acknowledges and understands that

if he should violate the conditions of any period of supervised release which may be imposed as part of his sentence, then Defendant may be imprisoned for up to 1 year, without credit for time already served on the term of supervised release prior to such violation. *See* Title 18, United Stated Code, Sections 3559(a)(6) and 3583(e)(3). Defendant understands that he cannot have the imposition or execution of the sentence suspended, nor is he eligible for parole.

3.   Alternatively, Defendant may be sentenced to a term of probation of up to 5 years. *See* Title 18, United States Code, Section 3561(c)(2). The Court may impose such conditions of probation as are set out in Title 18, United States Code, Section 3563. Defendant acknowledges and understands that if he should violate a condition of probation at any time prior to the expiration or termination of the term of probation, the Court may revoke the sentence of probation and resentence Defendant. *See* Title 18, United States Code, Section 3565.

### Mandatory Special Assessment

4.   Pursuant to Title 18, United States Code, section 3013(a)(1)(A)(iii), immediately after sentencing, Defendant will pay to the Clerk of the United States District Court a special assessment in the amount of twenty-five dollars ($25.00) per count of conviction. The payment will be by cashier's check or money order, payable to the Clerk of the United States District Court, c/o District Clerk's Office, P.O. Box 61010, Houston, Texas 77208, Attention: Finance.

### Cooperation

5.   The United States agrees to file a motion for departure pursuant to Section 5K1.1 of the United States Sentencing Guidelines because Defendant's cooperation amounted to "substantial assistance". Defendant further agrees to persist in that plea through sentencing and fully cooperate with the United States.

2

6.    Defendant understands and agrees that "fully cooperate," as that term is used herein, includes providing all information relating to any criminal activity known to Defendant, including but not limited to environmental offenses.    Defendant understands that such information includes both state and federal offenses arising therefrom.    In that regard:

(a)    Defendant agrees that this plea agreement binds only the United States Attorney for the Southern District of Texas and Defendant; it does not bind any other United States Attorney or any other unit of the Department of Justice;

(b)    Defendant agrees to testify truthfully as a witness before a grand jury or in any other judicial or administrative proceeding when called upon to do so by the United States.   Defendant further agrees to waive his Fifth Amendment privilege against self-incrimination for the purpose of this agreement;

(c)    Defendant agrees to voluntarily attend any interviews and conferences as the United States may request;

(d)    Defendant agrees to provide truthful, complete and accurate information and testimony and understands any false statements made by the defendant to the Grand Jury or at any court proceeding (criminal or civil), or to a government agent or attorney, can and will be prosecuted under the appropriate perjury, false statement, or obstruction statutes;

(e)    Defendant agrees to provide to the United States all documents in his possession or under his control relating to all areas of inquiry and investigation; and

(f)    Should the recommended departure not meet Defendant's expectations, the Defendant understands that he remains bound by the terms of this agreement and cannot, for that reason alone, withdraw his plea.

### Waiver of Appeal and Collateral Review

7.    Defendant is aware that Title 28, United States Code, section 1291, and Title 18, United States Code, section 3742, afford a defendant the right to appeal the conviction and sentence imposed. Defendant is also aware that Title 28, United States Code, section 2255, affords the right to contest or "collaterally attack" a conviction or sentence after the judgment of conviction and sentence has become final.   Defendant knowingly and voluntarily waives the right to appeal or

3

"collaterally attack" the conviction and sentence, except that Defendant does not waive the right to raise a claim of ineffective assistance of counsel on direct appeal, if otherwise permitted, or on collateral review in a motion under Title 28, United States Code, section 2255. In the event Defendant files a notice of appeal following the imposition of the sentence or later collaterally attacks his conviction or sentence, the United States will assert its rights under this agreement and seek specific performance of these waivers.

8.   In agreeing to these waivers, Defendant is aware that a sentence has not yet been determined by the Court.   Defendant is also aware that any estimate of the possible sentencing range under the sentencing guidelines that he may have received from his counsel, the United States or the Probation Office, is a prediction and not a promise, did not induce his guilty plea, and is not binding on the United States, the Probation Office or the Court.   The United States does not make any promise or representation concerning what sentence the defendant will receive. Defendant further understands and agrees that the United States Sentencing Guidelines are "effectively advisory" to the Court.   *See United States v. Booker*, 543 U.S. 220 (2005). Accordingly, Defendant understands that, although the Court must consult the Sentencing Guidelines and must take them into account when sentencing Defendant, the Court is not bound to follow the Sentencing Guidelines nor sentence Defendant within the calculated guideline range.

9.   Defendant understands and agrees that each and all waivers contained in the Agreement are made in exchange for the concessions made by the United States in this plea agreement.

### The United States' Agreements

10.   The United States agrees to each of the following:

(a)      If Defendant pleads guilty to Count 3 of the indictment and persists in that plea through sentencing, and if the Court accepts this plea agreement, the United

4

States will move to dismiss any remaining counts of the indictment at the time of sentencing;

(b)     If the Court determines that Defendant qualifies for an adjustment under section 3E1.1(a) of the United States Sentencing Guidelines, and the offense level prior to operation of section 3E1.1(a) is 16 or greater, the United States will move under section 3E1.1(b) for an additional one-level reduction because Defendant timely notified authorities of his or her intent to plead guilty, thereby permitting the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources more efficiently.

## Agreement Binding - Southern District of Texas Only

11.   The United States Attorney's Office for the Southern District of Texas agrees that it will not further criminally prosecute Defendant in the Southern District of Texas for offenses arising from conduct charged in the indictment.   This plea agreement binds only the United States Attorney's Office for the Southern District of Texas and Defendant.   It does not bind any other United States Attorney's Office.   The United States Attorney's Office for the Southern District of Texas will bring this plea agreement and the full extent of Defendant's cooperation to the attention of other prosecuting offices, if requested.

## United States' Non-Waiver of Appeal

12.   The United States reserves the right to carry out its responsibilities under guidelines sentencing.   Specifically, the United States reserves the right:

(a)     to bring its version of the facts of this case, including its evidence file and any investigative files, to the attention of the Probation Office in connection with that office's preparation of a presentence report;

(b)     to set forth or dispute sentencing factors or facts material to sentencing;

(c)     to seek resolution of such factors or facts in conference with Defendant's counsel and the Probation Office;

(d)     to file a pleading relating to these issues, in accordance with section 6A1.2 of the United States Sentencing Guidelines and Title 18, United States Code,

5

section 3553(a); and

(e)      to appeal the sentence imposed or the manner in which it was determined.

## Sentencing Guidelines Calculations

13.    The government and Defendant agree that Guidelines § 2Q1.2(a) applies to the offense of conviction and provides for a base offense level of 8.

14.    The government and Defendant agree that the following specific offense characteristic applies:

(a)      a 4-level increase pursuant to Guidelines § 2Q1.2(b)(1)(B) [offense resulted in a release or emission of a hazardous substance]; and

(b)      a 9-level increase pursuant to Guidelines § 2Q1.2(b)(2) [offense resulted in a substantial likelihood of death or serious bodily injury].

15.    The government and Defendant agree that the following departures relating to the offense level and the specific offense characteristic apply:

(a)      a 2 or 3 level downward departure pursuant to Guidelines § 2Q1.2, comment n. 4 [departure warranted because offense involved negligent conduct]; and

(b)      a 2 or 3 level upward departure pursuant to Guidelines § 2Q1.2, comment. n. 6 [departure warranted because offense resulted in death].

16.    Based on the foregoing, it is the understanding of the government and Defendant that the adjusted offense level for the underlying offense would be 21.

17.    The government and Defendant agree to recommend that the Court apply the 3-level downward adjustment of Guidelines § 3E1.1 (acceptance of responsibility), which would result in a total offense level of 18.

18.    It is the understanding of the government and Defendant that Defendant's criminal history category is I.   However, Defendant understands that he has no right to withdraw the plea

6

of guilty based on the Court's determination of Defendant's criminal history category.

19.   It is the understanding of the government and Defendant that, with a total offense level of 18 and criminal history category of I, Defendant's sentencing range would include a term of imprisonment of 27 to 33 months.   However, taking into account the statutory maximum penalties, Defendant's sentencing range includes a term of imprisonment 12 months.

20.   The government and Defendant reserve the right to recommend a sentence below the Sentencing Guidelines range.   Furthermore, as stated in paragraph 5, above, the government will file a motion pursuant to Guidelines § 5K1.1 stating that Defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense.

## Sentence Determination

21.   Defendant is aware that the sentence will be imposed after consideration of the United States Sentencing Guidelines and Policy Statements, which are only advisory, as well as the provisions of Title 18, United States Code, section 3553(a).   Defendant nonetheless acknowledges and agrees that the Court has authority to impose any sentence up to and including the statutory maximum set for the offense(s) to which Defendant pleads guilty, and that the sentence to be imposed is within the sole discretion of the sentencing judge after the Court has consulted the applicable Sentencing Guidelines.   Defendant understands and agrees that the parties' Sentencing Guidelines calculations set forth above  do not bind the Court and that the sentence imposed is within the discretion of the sentencing judge.   If the Court should impose any sentence up to the maximum established by statute, or should the Court order any or all of the sentences imposed to run consecutively, Defendant cannot, for that reason alone, withdraw a guilty plea, and will remain bound to fulfill all of the obligations under this plea agreement.

## Rights at Trial

22. Defendant understands that by entering into this agreement, he surrenders certain

rights as provided in this plea agreement.   Defendant understands that the rights of a defendant

include the following:

(a)     If Defendant persisted in a plea of not guilty to the charges, defendant would
have the right to a speedy jury trial with the assistance of counsel.   The trial may
be conducted by a judge sitting without a jury if Defendant, the United States, and
the court all agree.

(b)     At a trial, the United States would be required to present witnesses and other
evidence against Defendant.   Defendant would have the opportunity to confront
those witnesses and his attorney would be allowed to cross-examine them.   In turn,
Defendant could, but would not be required to, present witnesses and other
evidence on his own behalf.   If the witnesses for Defendant would not appear
voluntarily, he could require their attendance through the subpoena power of the
court; and

(c)     At a trial, Defendant could rely on a privilege against self-incrimination and
decline to testify, and no inference of guilt could be drawn from such refusal to
testify.   However, if Defendant desired to do so, he could testify on his own behalf.

## Factual Basis for Guilty Plea

23. Defendant is pleading guilty because he is in fact guilty of the charges contained in

Count 3 of the indictment.   If this case were to proceed to trial, the United States could prove each

element of the offense beyond a reasonable doubt.   The following facts, among others would be

offered to establish Defendant's guilt:

a)     E.I. DuPont de Nemours and Co. ("DuPont") owned a chemical plant in LaPorte,
Texas ("the LaPorte facility").

b)     A part of the LaPorte facility called the Insecticide Business Unit ("IBU")
manufactured, among other things, insecticides called Lannate and Vydate.

c)     Defendant Kenneth J. Sandel ran the IBU.   His title as of November 14, 2014,
was Unit Operations Leader.   Sandel supervised eight employees including two
engineers and four shift supervisors.    Those shift supervisors, in turn, each

8

managed approximately eight "operators" or workers.

d)    Sandel was responsible for ensuring that IBU shift supervisors, operators and engineers understood and complied with government safety, health and environmental regulations and DuPont's own safety, health and environmental policies and procedures, including requirements of Environmental Protection Agency ("EPA") Risk Management Program regulations.   More specifically, Sandel was "accountable for establishing and sustaining site safety culture, PSM [Process Safety Management] expectations, accountabilities and objectives …" He was required to "Set expectations for adherence to policies and procedures and safety standards"; "hold people accountable for Core Value compliance (SHE [Safety, Health and Environmental]/PSM, Ethics & Respect for People) …"; and "Establish[] managing processes for advancing and ensuring consistency of Core Values …"

e)    An EPA Risk Management Program regulation set out in Title 40, Code of Federal Regulations, Section 68.69(d) required DuPont to "develop and implement safe work practices to provide for the control of hazards during operations".   As an example of a hazardous activity, the regulation listed "opening process equipment or piping".

f)    In response to this regulation, the LaPorte facility developed a written safety procedure for opening a "hazardous process or system" to the atmosphere – an action commonly called a "line break" ("the LaPorte line break procedure"). Defendant Sandel was responsible for implementing this procedure at the IBU by making sure that operators understood and followed the procedure's requirements and did not release toxic chemicals inappropriately to the environment.

g)    The LaPorte line break procedure defined a hazardous process or system as "a process or system that contains any material at any pressure that could cause a risk of injury" including "especially gases in pipes" and "other lines that could contain material that is hazardous on contact or inhalation".   The procedure required workers to prepare and implement a written job plan that addressed safety, health and environmental issues before opening a drain valve on a hazardous system to the atmosphere (unless the line break was a routine operational task covered by a written operating procedure).   The line break procedure also required workers to "properly isolate" the section of the equipment to be opened and clear it of chemical hazards.   In addition, the procedure required workers to use appropriate personal protective equipment and control access to the affected location.

h)    To manufacture Lannate, the LaPorte facility used methyl mercaptan ("MeSH").

i)    MeSH is classified as an extremely hazardous substance pursuant to 42 U.S.C.

9

§ 11002(a)(2) because it has the potential to cause fatality from gross overexposure.   Any person who inhaled a sufficiently high concentration of MeSH gas would die quickly.   No treatment or antidote existed.   MeSH killed by weakening breathing muscles, causing fluid to collect in the lungs, and disrupting the process through which the body's cells create energy.

j)   The LaPorte facility had a vent system to transport certain waste gases from the Lannate and Vydate manufacturing processes to an incinerator.   The vent system had the potential to contain material that was hazardous on contact or inhalation. For example, the vent system could carry MeSH gas and nitrogen from the feed line that supplied liquid MeSH to the Lannate manufacturing process.     The vent system was therefore a hazardous system as defined by the LaPorte line break procedure.   The volume, concentration and danger of chemicals flowing through the vent system varied depending on the stage of the manufacturing process and other factors such as whether workers followed procedures and equipment functioned properly.

k)   Because a low point existed in the vent system on the third floor of the IBU manufacturing building, liquid condensate would sometimes form in the vent system and collect at this low point.   The liquid constricted the flow of waste gas through the vent system which caused high pressure in certain vessels in the manufacturing process. The liquid condensate was routinely drained by DuPont employees in order to reduce pressure in those process vessels and allow the manufacturing process to continue to operate.

The pressure buildup was a "known, persistent problem" that sometimes interfered with production. Sandel met with shift leaders and engineers on a daily basis to discuss operational issues, and the pressure problem was occasionally discussed at these meetings.

l)   IBU operators typically drained the vent system by opening a drain valve to the atmosphere inside the IBU manufacturing building.     Noxious fumes and a tarry substance of unknown composition often flowed out of the valve. Operators sometimes felt lightheaded and dizzy from the fumes. Many operators left the area for a while after opening the drain valve in order to avoid exposure to smelly fumes that escaped from the vent system through the drain.
IBU operators did not apply the LaPorte line break procedure when performing operational routine tasks. Operators counted it as a "line break" only when maintenance workers – not operators – opened a hazardous line.

Operators believed everyone at the IBU was aware that operators did not apply the line break procedure to routine operator tasks such as taking samples, attaching hoses and draining equipment. For example, Darryl Brown, one of four shift supervisors at the IBU, never heard anyone claim operators needed to obtain a line

break permit in order to carry out those routine operational tasks. Defendant Sandel was part of a team that audited compliance with the line break procedure, usually on an annual basis. The team consisted of Defendant Sandel, an engineer, a shift leader and an employee from one of the other DuPont units across the entire LaPorte site (PNIP, HF, or Crop Protection). The audits consisted of reviewing completed line break permits to check whether they were filled out correctly. Brown would meet with Sandel to review the results of the audits. Neither Sandel nor anyone else on the audit team ever questioned the fact that the line break permits they reviewed were only for maintenance-type activities.

m)      On February 9, 2014, an operator warned engineers in an email that IBU operators did not have a "safe and effective way" to drain the vent system but stated "the most safe and effective way I have found so far" was to attach a chemical hose to the drain valve and place the other end of the hose under the floor grate of a safety shower.

     An engineer forwarded the operator's email to Sandel with a recommendation that the operator receive "a $100 commitment to excellence award" for the operator's suggested solution.

     Sandel replied to the engineer that he approved the award to the operator, noting, it "furthers the street cred of the suggestion program when they see people getting paid for process improvement." Defendant Sandel should have read the entire email. However, Defendant Sandel failed to read the part of the email that stated IBU operators did not have a "safe and effective way" to drain the vent system.

     Separately, another engineer also forwarded the same operator's email to Sandel noting that the operator "did a great job investigating the liquid in the vent system this weekend." Again, Sandel did not read the part of the email that stated IBU operators lacked a "safe and effective way" to drain the vent system.

n)      The next day, a DuPont engineer formally instructed IBU operators in writing to drain the vent system every shift in the manner described in the prior day's email. The instructions read in part: "Please drain the MeSH header on the 3rd floor once per shift – use a hose to put it under a running safety shower until the liquid stops." The engineer issued these instructions without reviewing how they affected safety, health or the environment. No one ever tested the liquid that came out of the vent system to learn what it was. Likewise, no one determined the chemical makeup of the gas inside the vent system, measured how much gas escaped when workers opened the drain valve, or analyzed how the gas could affect exposed workers or the environment.

     DuPont engineers re-issued these same or similar written instructions more than 150 times during the remainder of 2014.

11

o)   IBU workers drained the vent system many times in the manner directed by the
DuPont engineers in the written instructions. This method of draining the vent
system violated the LaPorte line break procedure's requirements set forth above.

Defendant Sandel should have known that IBU operators drained the vent system
in the manner directed by the engineers and should have prevented it from
happening.

For example, Defendant Sandel had access to the written engineering instructions
described above.   Defendant Sandel and his direct supervisor, the Unit Manager,
also received periodic email reports from shift leaders noting that operators had
drained the vent system.   For example, one shift leader included the following
statements in emails to Defendant Sandel:

• "Drained incinerator vent line and problem cleared" (7/19/2014)
• "Drained 3rd fl. MESH vent header" (8/15/2014)
• "Drained NRS vent header on 3rd floor" (10/10/2014)
• "Flushed, drained, and purged vent header from NRS to low point drain at 7010"
(10/23/2014).   Defendant Sandel responded to this email by saying "Great
troubleshooting on your shift, as usual".

p)   In late October 2014, Defendant Sandel, a DuPont operator and an engineer
discussed a proposal to prevent fumes from escaping into the air when operators
drained the vent system inside the IBU building.   Sandel was thereby put on
notice that operators drained the vent system to the air inside the IBU building.

q)   On November 12, 2014, a DuPont employee inadvertently left a valve open on the
liquid MeSH feed line causing water to enter the line.   Due to cold temperatures,
the liquid MeSH reacted with the water inside the feed line forming hundreds of
pounds of a slushy material called a hydrate.   The hydrate blocked the flow of
MeSH through the feed line to the Lannate process.   As a result, the Lannate
manufacturing process was shut down.   (The Vydate manufacturing process
continued to operate).

r)   On November 14, 2014, DuPont employees, including Defendant Sandel, four
engineers and the operator who served as the daytime shift leader (collectively,
the "Tech Team"), met to discuss how to clear the hydrate from the piping.   The
Tech Team determined that the operators should heat the entire outside of the
piping with hot water hoses and use a series of valves located at railcar unloading
spots to vent excess pressure caused by the MeSH returning to vapor form into the
vent system.   To safely vent the excess pressure without introducing liquid to the
vent system, the valves had to be cracked rather than fully opened.

12

s)      Although operators routinely used hot water on the MeSH feed line where it entered another vessel (the MeSNa Cooler), nobody had ever before warmed the entire MeSH feed line with hot water, attempted to melt such a large volume of MeSH hydrate, or configured valves to allow gas to flow from the feed line into the vent system at the railcar spots.   However, no one at the meeting formally evaluated whether it was safe to do so, and no one created a written job plan. A DuPont engineer did summarize the plan in a few sentences written on a flip chart in a conference room but those sentences did not explain which specific valves to open to connect the feed line to the vent system, how far to open each valve, how long to keep each valve open, how to prevent MeSH from entering the vent system in liquid form, what use to make of the pump at the MeSH storage tank, whether to isolate the MeSH in the storage tank from the feed line, or when to attempt to restart flow of MeSH into the manufacturing process.

t)      Defendant Sandel observed these activities being performed in the field on November 14, 2014.   Sandel knew the vent system had the potential to contain hazardous gases including MeSH.   In fact, Sandel reported to the LaPorte plant manager and others by email on November 14, 2014, that the vent system would contain MeSH gas that night.

u)      When the day shift ended, the line had not been fully cleared.   At shift change, the day shift DuPont operators provided oral instructions to their counterparts on the incoming night shift.   However, Defendant Sandel and other DuPont employees should have, but failed, to provide written sufficient instructions for how to safely clear the blockage on the remaining part of the line.

        Defendant Sandel also should have, but failed, to warn operators not to open drain valves on the vent system that night because Sandel was aware that some manufacturing processes would continue to operate during the night shift.

v)      The night shift, lacking written instructions, fully opened valves connecting the MeSH feed line to the vent system and left the MeSH pump running while hot water was applied to the outside of the MeSH feed line. When the blockage cleared on the morning of November 15, 2014, liquid MeSH began to flow into the vent system.   The liquid MeSH in the vent system caused high pressure to develop in certain manufacturing vessels.

w)      A DuPont employee, believing incorrectly that the high pressure was caused by liquid condensate present in the vent system during normal operations (and not by liquid MeSH), directed another DuPont employee to drain the vent system on the 3rd floor of the IBU manufacturing building in the usual manner.

x)      That DuPont employee began to drain the vent system without following the Laporte line break procedure and opened valves on the vent system expecting to

13

drain liquid condensate.   Instead, thousands of pounds of liquid MeSH escaped from the vent system, vaporized into the air, and ultimately traveled downwind into the city of Deer Park, Texas.   The MeSH gas killed four DuPont employees located inside the IBU manufacturing building, injured several others, and also placed persons located in areas to which the public had access in imminent danger of serious bodily injury.

y)  Thus, on or about November 15, 2014, Defendant Sandel negligently released MeSH to the ambient air and at the time negligently placed another person in imminent danger of death or serious bodily injury.

### Breach of Plea Agreement

24.  If Defendant should fail in any way to fulfill completely all of the obligations under this plea agreement, the United States will be released from its obligations under the plea agreement, and Defendant's plea and sentence will stand.   If at any time Defendant retains, conceals, or disposes of assets in violation of this plea agreement, or if Defendant knowingly withholds evidence or is otherwise not completely truthful with the United States, then the United States may move the Court to set aside the guilty plea and reinstate prosecution.   Any information and documents that have been disclosed by Defendant, whether prior to or subsequent to this plea agreement, and all leads derived therefrom, will be used against defendant in any prosecution.

### Fines

25.  Defendant understands that under the Sentencing Guidelines the Court is permitted to order Defendant to pay a fine that is sufficient to reimburse the government for the costs of any imprisonment or term of supervised release, if any.   Defendant agrees that any fine imposed by the Court will be due and payable immediately, and Defendant will not attempt to avoid or delay payment.   Subject to the provisions of paragraph 7, above, Defendant waives the right to challenge the fine in any manner, including by direct appeal or in a collateral proceeding.

### Complete Agreement

14

26.    This written plea agreement, consisting of 1~~6~~ 15 pages, including the attached addendum of Defendant and his attorney, constitutes the complete plea agreement between the United States, Defendant, and Defendant's counsel.   No promises or representations have been made by the United States except as set forth in writing in this plea agreement.   Defendant acknowledges that no threats have been made against him and that he is pleading guilty freely and voluntarily because he is guilty.

27.    Any modification of this plea agreement must be in writing and signed by all parties.

Filed at ___Houston___, Texas, on ___April 24___, 2023.

_____
Defendant

Subscribed and sworn to before me on ___April 24___, 2023.

NATHAN OCHSNER, Clerk
UNITED STATES DISTRICT CLERK

By:    _____
Deputy United States District Clerk

APPROVED:

Alamdar Hamdani
United States Attorney

By:

_____
John R. Lewis
Assistant United States Attorney
Southern District of Texas

_____
Amy Craig
Attorney for Defendant
Kenneth J. Sandel

15

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ' |
| | ' |
| **v.** | ' **CRIMINAL NO. H-21-16** |
| | ' |
| **KENNETH J. SANDEL,** | ' |
| **Defendant.** | ' |

## PLEA AGREEMENT -- ADDENDUM

I have fully explained to Defendant his rights with respect to the pending indictment. I have reviewed the provisions of the United States Sentencing Commission's Guidelines Manual and Policy Statements and I have fully and carefully explained to Defendant the provisions of those Guidelines which may apply in this case. I have also explained to Defendant that the Sentencing Guidelines are only advisory and the court may sentence Defendant up to the maximum allowed by statute per count of conviction. Further, I have carefully reviewed every part of this plea agreement with Defendant. To my knowledge, Defendant's decision to enter into this agreement is an informed and voluntary one.

_____         _____
Attorney for Defendant                              Date

I have consulted with my attorney and fully understand all my rights with respect to the indictment pending against me. My attorney has fully explained, and I understand, all my rights with respect to the provisions of the United States Sentencing Commission's Guidelines Manual which may apply in my case. I have read and carefully reviewed every part of this plea agreement with my attorney. I understand this agreement and I voluntarily agree to its terms.

_____         _____
Defendant                                               Date

16